UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NEWPORT NEWS DIVISION

**In re:**

| | |
|---|---|
| WELLINGTON APARTMENT, LLC, | Case No. 04-50301-DHA |
| Debtor. | Chapter 11 |
| | |
| WELLINGTON APARTMENT, LLC, | |
| Plaintiff, | |
| v. | APN 05-5029 |
| CHARLES CLOTWORTHY, *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Complaint of Wellington Apartment, LLC ("Wellington," "Plaintiff" or "Debtor") against Charles Clotworthy ("Clotworthy"), Richard Merel ("Merel"), Steven Byers ("Byers"), Garfield & Merel, Ltd. ("G&M"), WP New Orleans, L.L.C. ("WP New Orleans"), and WPN, L.L.C. ("WPN"),[1] (collectively referred to as "the defendants"). The facts and issues involved in this matter are extremely complicated because of

---

[1] The Complaint included Poydras (Louisiana), LLC ("Poydras Louisiana") and Marc New Orleans, LLC ("Marc New Orleans") as defendants, but the Plaintiff ultimately settled its case against both of those defendants prior to trial; therefore they will not be addressed herein.

1

the parties' actions. While the complaint alleges eleven causes of action against the defendants, they all boil down to one ultimate question: did the defendants deprive the debtor of $1,615,000 in assets by fraudulently eliminating the debtor's interest in real property located in New Orleans, Louisiana? After making our way through the labyrinth of facts in this case, this Court makes the following Findings of Fact and Conclusions of Law.

This is a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## I. FINDINGS OF FACT

This case is very fact specific and, unfortunately, as stated above, the underlying facts are quite convoluted; the Court has attempted to organize them in the most efficient manner possible.

To begin the confusion in this case, there are two different Wellington entities, Wellington Apartments, LLC, organized in Connecticut ("Wellington CT") and Wellington Apartment, LLC, organized in Virginia ("Wellington VA"). The only difference in the names of the entities is the "s" at the end of the word "Apartment" in the Connecticut company. Wellington CT is owned equally by Hamilton Apartments, LLC and AR Investments, LLC.[2] Wellington VA is owned equally by N.I. USA, LLC and Woodland Holding, LLC. N.I. USA, LLC is owned by Ran Nizan ("Nizan") and his wife and Woodland Holding, LLC is owned by

---

[2] It is unclear who owns AR Investments, LLC; Cohen testified that he and Ran Nizan each owned 50% of that entity (Tr. p. 721), but Nizan's personal bankruptcy schedules and his testimony indicate that N.I. USA and Cohen were equal partners in that venture. (Tr. p. 305, Def. Ex. AH). It is not known who owns Hamilton Apartments, LLC.

2

Nizan's father and his father's business partner. Nizan is the manager of both Wellington entities and both share Nizan's home address in Danbury, Connecticut. (Tr. 77).

A. Procedural History

On November 13, 2002, Wellington CT filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the District of Connecticut, Bridgeport Division. The case was converted to one under Chapter 7 of the Code with Wellington CT's consent on January 23, 2003,[3] and was transferred to the Eastern District of Virginia, Newport News Division on December 10, 2004, at the request of First Bank & Trust Company of Illinois ("First Bank"), an alleged creditor in that case. The term "alleged" is used because there was a dispute over the enforceability of the note payable to First Bank, as well as questions regarding the ownership of the property pledged as collateral for the loan; Wellington CT's schedules state that the signature on the note is a forgery. It appears, however, that these issues have been resolved in the litigation described below between First Bank and Wellington VA.

On January 5, 2004, Wellington VA also filed for relief under Chapter 11 of the Code in the District of Connecticut, Bridgeport Division, and its case was transferred to the Eastern District of Virginia, Newport News Division, on February 3, 2004.[4] The only asset of Wellington VA was a 152-unit apartment complex located in Newport News, Virginia.

On May 12, 2004, First Bank & Trust Company of Illinois filed an adversary proceeding

---

[3] This conversion was prompted by the court's issuance of an Order to Show Cause.
[4] This case was filed pro se by Ran Nizan as the debtor's designee, and listed the debtor's name as Wellington Apartments, LLC, identical to that of Wellington CT. The name was corrected to Wellington Apartment, LLC by an Amended Petition that was filed on March 4, 2004, by Karen Crowley, counsel for the Wellington VA.

against Wellington VA for payment of a note allegedly secured by a Second Deed of Trust against the debtor's apartment complex.[5] The debtor argued that the signature on the Second Deed of Trust was a forgery and that it did not owe any money to First Bank based on that document.[6]

On June 1, 2005, the debtor filed the instant Complaint against the defendants based on their allegedly fraudulent conduct surrounding the placement of First Bank's Second Deed of Trust on the debtor's apartment complex. On July 22, 2005, the defendants filed a Motion to Dismiss Counts I, II, IV, V, VI, VII, VIII and IX of the Complaint, which Motion they withdrew in open court on September 21, 2005. The defendants eventually answered the Complaint on October 4, 2005.

On July 14, 2005, the instant adversary proceeding, the adversary proceeding filed by First Bank against the debtor and an Objection to Claim of First Bank filed by the debtor were procedurally consolidated by Order of the Court.

While the attorneys for both sides have managed this case and their clients with the utmost professionalism, the parties themselves have been uncooperative with each other. The discovery motions began on October 27, 2005, when the debtor filed its first Motion to Compel against Merel, Clotworthy, WPN and G&M; the next day the defendants filed a Motion to Sever this adversary proceeding from the other litigation listed above and stay the discovery, or in the alternative for the Court to issue a protective order to protect certain information, and an

---

[5] While the litigation between the debtor and First Bank was pending, debtor's apartment complex was sold pursuant to an order of this Court.

[6] FRD, LLC, a subsidiary of First Bank, purchased the First Deed of Trust to protect First Bank's interest as the holder of the allegedly forged Second Deed of Trust. The debtor never disputed its debt to FRD on the First Deed of Trust. In fact, that undisputed debt was paid from the proceeds of the sale of the apartment complex.

4

objection to the discovery propounded by the debtor. The debtor objected to the Motion to Sever and after a hearing on November 15, 2005, the Court denied the Motion and ordered the defendants to answer the discovery requests of the debtor.

On December 16, 2005, the debtor filed a Motion for Sanctions against Merel, Clotworthy, WPN and G&M, and after a hearing held on January 3, 2006, the Court declared WPN to be in default for failing to answer discovery and ordered Clotworthy, Merel and G&M to fully and completely answer interrogatories propounded by the debtor and produce all requested documents. The debtor then filed a Motion to Approve Entry of an Order Establishing Certain Facts as to WPN in light of its default. That motion was not decided because prior to a ruling, WPN requested that the Court reconsider its ruling regarding WPN's default. The Court granted the reconsideration motion, but refrained from issuing a second ruling on WPN's default, and instead took the matter under advisement. Given the ruling found in this Memorandum Opinion and Order, the debtor's Motion to establish certain facts as to WPN is moot and a hearing on the issue of sanctions against the defendants will be scheduled pursuant to the Court's order entered February 17, 2006.

On February 7, 2006, the debtor filed a second Motion for Sanctions against Merel and G&M for failing to timely respond to discovery, and then providing unsworn answers to Interrogatories and providing minimally responsive documents to a Request for Production of Documents more than two weeks after the deadline to respond. That same day the defendants filed a Motion for Summary Judgment or in the Alternative, Partial Summary Judgment, based on several equitable defenses. A week later the defendants filed their own Motion to Compel, asking that Nizan be forced to turn over copies of his tax returns for the years 2000-2004, to

which debtor's counsel responded that she could only ask Nizan to turn over his tax records, but that she could not force him to do so as Nizan is not the debtor. The Court agreed with the debtor, but stated that the defendants would have the opportunity to ask Nizan about his tax records when he appeared at the trial. As for the Motion for Summary Judgment, the Court heard arguments on March 1, 2006, and denied such relief as to all counts except those involving legal malpractice and breach of fiduciary duties by Merel and G&M, which the Court took under advisement. The Court advised that the defendants could renew their summary judgment motion at trial.

Prior to trial, the debtor and First Bank miraculously settled their dispute, which resulted in Wellington VA paying First Bank $2,300,000. This settlement meant that the trial would deal only with the Complaint in the instant adversary proceeding.

Finally, the trial was held over five days, March 1, 2, 3, 6, and 8, 2006. After the plaintiff debtor rested its case, the defendants moved for Judgment on Partial Findings pursuant to rule 52(c) of the Federal Rules of Civil Procedure as incorporated into Bankruptcy Rule of Civil Procedure 7052(c). The defendants argued they were entitled to such relief for two reasons: 1) this action is basically an indemnification proceeding and the debtor failed to prove actual or potential liability on First Bank's claim and did not show that the settlement was reasonable, and 2) that the debtor failed to meet its burden of proof on the legal malpractice and breach of fiduciary duty claims for several reasons, including the fact that the debtor did not call an expert witness to opine on Illinois law; it failed to prove an on-going attorney client relationship between the debtor and Merel/G&M; and it did not prove that Merel/G&M were informed that the services were being provided for the benefit of a third party. The debtor responded that the

action is not one of indemnification, but rather one of lost equity to the debtor and that no expert was needed as both Merel and G&M failed to meet the minimum standards set forth in the Illinois Code of Professional Responsibility.

The Court overruled the defendants' Motion for Judgment on Partial Findings for two reasons: 1) the Court had not had time to review the depositions of two important witnesses, Gerry Nudo ("Nudo") and Robert Walters ("Walters"), and 2) there was sufficient evidence before the Court regarding the activities of Merel and G&M during the original loan transaction, the 2002 loan modification and the 2004 loan restructuring to overcome the motion. Finally, as to the reasonableness of the settlement between the debtor and First Bank, the Court found that the Order approving the settlement declared it fair and equitable; therefore, that issue was binding under the doctrine of *res judicata* and the defendants were required to proceed with their case. Upon completion of the trial, the parties submitted their Findings of Fact/Conclusions of Law and their replies.

B. History of Ran Nizan and the Debtor, Wellington VA

Nizan was born and raised in Israel and moved to the United States when he was 25 years old. (Tr. pp. 77-78). He has lived and worked in Connecticut since 1995, which is also when he began buying and managing income producing real property. (Tr. pp. 77, 83). In 1997, Nizan purchased Ennis Management, a previously existing property management company, and formed a new entity, Ennis Management, L.L.C., at which time Nizan became a full-time property manager. (Tr. pp. 86-87). Nizan was managing two hundred fifty (250) apartment units by the end of 1997, one thousand five hundred (1,500) units by the end of 1998, and almost three thousand (3,000) units by the end of 1999. (Tr. p. 87). Nizan attributes the tremendous growth of

the company to the acquisition efforts of Avram Cimmering ("Cimmering"), a person with whom Nizan partnered in 1997 to purchase and manage properties all over the United States. (Tr. pp. 89-90, 712).

Throughout their business relationship, Nizan and Cimmering formed many single purpose entities to purchase the properties. (Tr. p. 90). Nizan testified that Cimmering would locate properties and acquire the hard money loans to purchase them. (Tr. pp. 88-89). These original loans were always short-term and carried high interest rates and fees; the consistent goal was for Cimmering to obtain refinancing with conduit lenders, "Wall Street firms that [] sell bond[s to] finance the deal." (Tr. p. 98). Nizan's responsibilities in the partnership included inspecting the properties prior to their purchase and then managing them once the sales were complete. (Tr. p. 90). Nizan testified that he was involved very little in obtaining financing for any of the properties he and Cimmering bought, since he was very busy performing the day-to-day functions of managing their many units. (Tr. p. 90.).

Wellington VA was formed in 1997 for the sole purpose of acquiring a 152-unit apartment complex in Newport News, Virginia for a purchase price of $2,300,000 (Tr. 117-18), which acquisition was completed on December 31, 1997. (Pl. Ex. 1). Wingate Realty Finance Corporation ("Wingate") funded the $1,996,000 conduit loan (Tr. p. 118-19), which was collateralized by a deed of trust against the apartment complex. (Pl. Ex. 1). Nizan's father and his business partner contributed the remainder of the purchase price. (Tr. p. 100). The Wingate deed of trust is filed in the land records for the City of Newport News. (Pl. Ex. 1).

Eventually, in 1999, Nizan's relationship with Cimmering soured and the partners separated their holdings (Tr. p. 91); each took ownership of approximately one thousand two

hundred (1,200) units, or roughly half of the units they owned jointly at the time.[7] (Tr. p. 91). One of the properties Nizan obtained during this separation was Wellington Apartments. As stated above, Nizan is part owner and a managing member of Wellington VA and is authorized to make decisions for the debtor. (Tr. p. 120).

C. <u>Connections between Wellington VA and the defendants</u>

There are a multitude of players in the saga of the Wellington/First Bank loan and it is difficult to sort out the relationships. In an effort to more fully understand what has transpired in this case, the Court lists here each person/entity separately and describes their involvement with the debtor.

*Amnon Cohen*

Nizan met Amnon Cohen ("Cohen") in 1996 through a mutual friend when Nizan was attempting to secure financing for one of his projects. (Tr. pp. 92, 710). Mr. Cohen was working for Harold Baker, a mortgage broker, at the time of their meeting. (Tr. p. 710). Nizan was using Harold Baker's services during this time period.[8] (Tr. pp. 92-93). At some time during 1997 or 1998, Nizan and Cohen formed their own business, Aspen Capital, a real estate and mortgage brokerage. (Tr. pp. 93, 712). Cohen owned 49.5% of the business and MB Holding, a company owned equally by Cimmering and Nizan, owned 50.5%. (Tr. p. 93).

---

[7] Cimmering eventually defaulted on one of the loans for which he and Nizan were personally responsible, but that Cimmering had agreed during their business separation that he would pay. Therefore, a second business separation agreement was signed by Nizan and Cimmering, wherein Nizan bought Cimmering out of the defaulted property. Nizan was able to do so by bringing in another investor.

[8] It is unclear from the evidence presented whether Nizan used Baker's services as a result of being introduced to Cohen or vice versa.

Cimmering and Cohen worked in Aspen Capital's office in New York, locating properties for sale and obtaining the financing for their purchase. (Tr. p. 94). Nizan worked for his property management company in Connecticut. (Tr. p. 94). Nizan testified that he instructed his property management company to provide Cimmering with whatever information he needed to complete the financing of new properties, which information Cimmering was said to have requested daily. (Tr. p. 95).

When Cimmering and Nizan divided their interests in 1999, Cimmering retained his ownership of Aspen Capital and Nizan transferred his interest in the company to Cohen. (Tr. p. 94). Nizan testified that there then came a time that Cohen no longer wanted to work with Cimmering and as a result, Cimmering transferred Nizan's previously owned interest back to Nizan. (Tr. pp. 94-95). It is unclear from the evidence presented at trial what happened to Cimmering's interest, but Nizan and Cohen continued to operate Aspen Capital. (Tr. p. 94.). Nizan testified that Cohen took over the financing and acquisition aspects of the business and Nizan continued to handle the property management duties. (Tr. p. 95).

Cohen handled all the loan documentation once Cimmering was no longer involved. (Tr. p. 713). Cohen stated that he created Nizan's financial statements, but that the information came directly from Nizan's office. (Tr. p. 714). Cohen testified that he often signed Nizan's name to documents while working for Aspen Capital, but always with Nizan's permission. (Tr. p. 719-20). Cohen further testified that he and Nizan had a very close relationship and that Cohen spent time at Nizan's home and with his family, and that the two talked several times a day by telephone. (Tr. p. 720).

*Steve Byers & the Wexford & WexTrust Entities*

Nizan met Steve Byers ("Byers") in mid-1999 on the same day Nizan finalized his separation from Cimmering. (Tr. pp. 100-01). Cimmering and Cohen had been negotiating for financing with Steve Byers' company, HSA/Wexford BancGroup ("HSA/Wexford"), for the Lee Hall Apartments, a project located in Virginia. (Tr. p. 101). Nizan knew of these negotiations, needed to serve Cimmering with the legal business separation papers, and knew that Cimmering would be at the HSA/Wexford offices in Chicago on a date specific (Tr. p. 101); Nizan traveled to Chicago to deliver the separation papers to Cimmering in person and met Byers at the HAS/Wexford office. (Tr. p. 101).

The Lee Hall Apartments was the first loan that HSA/Wexford provided funding for on any of Nizan's entities. (Tr. pp. 101-02). HSA/Wexford was a table lender, meaning it would perform the underwriting on the loan and then transfer the package to a conduit lender, who would fund the deal simultaneously with HSA/Wexford. (Tr. pp. 100-01). These types of loans were made in the name of HSA/Wexford, but because of the simultaneous funding would immediately be transferred to the conduit lender. (Tr. p. 101). This arrangement allowed HSA/Wexford to count the loan among the deals that it brokered, without having to actually fund the loan.

In early 2000, Byers wanted to leave HSA/Wexford and start his own company, but he needed capital. (Tr. p. 102). Someone from HAS/Wexford contacted Cohen and as a result, Nizan's father and his father's business partner invested $250,000 in a new company called Wexford BancGroup. (Tr. p. 102). That investment bought them a 15% ownership interest in the new company, which ownership was held by an entity called Whitestone. (Tr. p. 102). Whitestone was owned equally by Nizan's father and his partner (they collectively owned 50%)

and Cohen and Nizan (who collectively owned the other 50%). (Tr. p. 103). Nizan testified that Cohen was given ownership in Wexford BancGroup to allow him to obtain an interest in the properties whose loans he brought to the group, which was something Cohen required and had learned from Cimmering. (Tr. p. 103). Cohen felt he deserved the ownership interests because he was bringing in many loans (both Nizan- and non-Nizan-related) and was facilitating all of the loan documentation between Wexford BancGroup and its borrowers.

Nizan states that Wexford BancGroup was headquartered in Chicago and that he had very little to do with the management of that company. (Tr. pp.104-05). He testified that he did not have signatory authority on any Wexford BancGroup bank accounts and that the only distribution ever made by Wexford BancGroup to Whitestone, of which he was also the manager, was $15,000 in late 2000. (Tr. pp. 104-05). He testified he did receive K-1s from Wexford BancGroup, but never received a copy of Wexford BancGroup's full tax return. (Tr. p. 106).

In 2001, Byers and Nizan formed Wexford Trust as an umbrella organization into which they merged all of Byers and a portion of Nizan's properties. (Tr. p. 836). The two men obtained a $3,000,000 line of credit from Cole Taylor Bank, which appears to have been the beginning of the end of their business relationship. (Tr. p. 836-37). This line of credit was to be used as a bridge loan for Wexford Trust's various properties when bills became due, but rents had not yet been received. (Tr. p. 837). According to Byers, Nizan was the only person who had utilized the line of credit and by the fall of 2001, Nizan had drawn $1,600,000 from the line of credit loan. (Tr. p. 837-38). Additionally, Byers testified that around the same time period, the $600,000 that Wexford Trust had deposited in a compensating balance account with Cole Taylor

Bank also disappeared. (Tr. p. 838). Byers said that when pressed, Nizan stated he would return the money and attempted to obtain an investor to do so, but was ultimately only able to repay $300,000-$400,000. (Tr. p. 838-39). Byers testified that he repaid the full balance due to Cole Taylor Bank. (Tr. p. 839).

In 2002, Wexford BancGroup ceased operations. (Tr. p. 527). In 2003, WexTrust Capital was formed and is Byers' current operating company, which he owns with Cohen. (Tr. p. 524). WexTrust Capital owns Wexford Equity Partners, which identifies income producing properties available for purchase. (Tr. p. 526).

Byers developed or bought into other entities as well. In 2000, he formed Wexford Capital Partners, but the company was not capitalized and had no assets. (Tr. pp. 522-23). Byers testified that the purpose of the company was to sign contracts for the purchase of property and then assign those contracts to other entities. (Tr. p. 523). However, Wexford Capital Partners never purchased any assets. (Tr. p. 524). Additionally, Byers bought into Aspen Capital after Nizan and his partners bought into Wexford BancGroup (*See* Tr. p. 620), and he is heavily involved in several real estate ventures with Clotworthy and Merel (Tr. p. 309).

One of the most important entities in which Byers is a partner, as it relates to these proceedings, is WPN. He and Nizan became equal partners in WPN in 2000, when each purportedly contributed $750,000 in capital contributions to fund the company. (Tr. p. 574). This money, as is explained below, was actually derived from equity in Wellington Apartments and used to invest in the Poydras building.

*Wexford/Wextrust Entities, First Bank and Ran Nizan*

Wexford BancGroup was one of First Bank's top five customers from 2000-2002, while it was in operation, earning First Bank millions of dollars in loan fees and interest. (Tr. p. 529).

Byers testified that First Bank liked to control its lending environment and did so by keeping their staff small, with two people, Mike Winter and Charlene Madura, basically "running the show." (Tr. p. 530). He also pointed out that First Bank was very "tight-lipped" about their loan approval process, but did acknowledge that loans were generally approved by the nod of either Mike Winter or the president of the bank, Mr. Hershenhorn. (Tr. pp. 530-31). Later, Byers stated that he thought First Bank was very efficient because they would close their loans in short periods of time based on the approval of Mike Winters and without a lot of paperwork. (Tr. p. 540).

Nizan testified that in 1999 and 2000, Wexford BancGroup was the primary source of financing of both hard money and conduit loans for Nizan related entities. (Tr. p. 106). Cohen was the primary person interacting with Wexford BancGroup on behalf of Nizan and his entities. (Tr. p. 107). Wexford BancGroup obtained most of those loans through First Bank; in fact, eight loans for Nizan-related entities[9] over the period of 1999-2000 were financed with hard money loans through First Bank, only two of which were successfully refinanced into long-term loans. (Tr. pp. 107-10).

Nizan testified that he had almost no contact with First Bank regarding any of the loans, but rather Cohen, Byers, and Rondella Hunt, Byers' secretary, handled all communications with First Bank. (Tr. p. 110). Nizan noted that First Bank was difficult to deal with because they did

---

[9] Those loans were on the following properties: Linwood, Wichita Apartments, Bridgeway, Wintergreen, Uptowne, 158, and Arbor/Oxford.

14

not return phone calls. (Tr. p. 111). Nizan stated that any requests for documents that First Bank made of him had a specific chain of command; First Bank would ask Wexford BancGroup for the documents, which would in turn ask Aspen Capital, which would contact Nizan's office to obtain the documents. (Tr. p. 111). Byers testified that Cohen "was typically the point person, the broker, and the processor for Ran Nizan." (Tr. p. 538). However, Byers also testified that he thought Nizan dealt directly with First Bank on the Arbor/Oxford loan. (Tr. p. 536).

For every loan that Wexford obtained through a Nizan-related entity, Wexford was supposed to be paid a broker's fee from three sources, First Bank, the lender and Aspen Capital, but that there were times when Wexford would take ownership interest in properties in lieu of such fees. (Tr. p. 534).

*Charles Clotworthy*

Charles Clotworthy ("Clotworthy") began working for Byers in 1997 as an employee of Wexford BancGroup and currently works for WexTrust Capital. (Tr. p. 309). Clotworthy, Byers and Rick Merel ("Merel") are also business partners, who currently own or have owned several pieces of real estate together. (Tr. p. 309-10). As explained below, Clotworthy and Merel purchased Nizan's interest in WPN from Nizan's personal bankruptcy estate and consequently became partners with Byers in that company, sharing in its distributions. (Tr. p. 462). The three men are also equal partners in WP New Orleans (Tr. pp. 322-23), a company which improperly appropriated WPN's capital contribution to the purchase of the Poydras building. This, too, is explained below.

15

*Rick Merel/Garfield & Merel*

Merel is an attorney and licensed real estate broker in Chicago, Illinois; he has been practicing law for almost thirty-one years. (Tr. pp. 346-47). He is a named partner in the firm of Garfield and Merel ("G&M"), which consists of three partners and two associate attorneys. (Tr. pp. 346-47). Steve Alderman ("Alderman") and Mr. Garfield are the other two partners. (Tr. p. 347). From the evidence presented at trial, Garfield & Merel ("G&M") first became involved with Byers and Nizan in 1997, when G&M performed the necessary legal work to create Wexford BancGroup, the first entity in which Byers and Nizan partnered. (Tr. p. 519). Merel and/or G&M went on to represent many of Byers' and Nizan's interests and did so particularly during the 2001 loan modification and the 2002 loan restructuring with First Bank. *See* discussion *Infra*, Sections D and E.

Additionally, Merel and Byers were partners in several real estate ventures, specifically Wichita, Bridgeway and Wintergreen Apartments. (Tr. p. 152). G&M represented Wexford BancGroup in the Wichita and Lansdale closings (Tr. pp. 153, 359-60) and First Bank in Bridgeway closing. (Tr. p. 153). During such closings, Nizan testified that it was not unusual for Byers to demand a percentage of ownership in the properties on which he performed work, and usually made such demands just days before the scheduled closing so that declining his demand was not truly an option. For example, in the Lansdale acquisition, Nizan felt he had to give Byers a percentage of ownership in the apartments when it was demanded just days before

16

closing, because the money had already been advanced by the bank and a down payment had been made on the loan. (Tr. p. 153-155, Pl. Ex. 142[10]).

G&M also represented First Bank in several real estate closings. (Tr. pp. 489-93).

*Gerry Nudo/Marc New Orleans*

Gerald Nudo ("Nudo") is one of the principals in Marc Realty, which is an Illinois limited liability company that primarily manages real property, mostly in the Chicago area. (Nudo dep. pp. 5-6). Nudo testified that he became involved with the parties when Merel called him to tell him of the Poydras building, an investment opportunity in New Orleans. (Nudo dep. p. 8-9). After analyzing the situation, Marc Realty decided to invest $3,800,000 to facilitate the acquisition of the Poydras building. (Nudo dep. pp. 9-10). Nudo testified that he understood that an additional capital contribution was going to come from Lobel and Weber, who were jointly contributing $1,000,000, and that the remainder of the money was going to be provided through a bank loan. (Nudo dep. pp. 10-11). He then testified that the business plan he had hoped would work was not feasible because the rents were lower than anticipated. (Nudo dep. p. 23). Later, in mid-2003 Marc Realty wanted to sell its interest in the Poydras building and began marketing its ownership by word of mouth. (Nudo dep. p. 25). Nudo stated that Marc Realty had several contracts on the building, but finally sold to Stewart Capital. (Nudo dep. p. 27, 31). Lobel and Weber decided to sell their interest along with Nudo's group. (Nudo dep. p. 32). Nudo testified that at the time his group was attempting to sell their ownership in the building, Nizan tried to tell him of a dispute he was having with his partners, Merel, Byers and Clotworthy over the

---

[10] While exhibit 142 is a letter from the lender, Wexford Bancgroup, Nizan reiterated that Byers was closely affiliated with the lender as he did the underwriting for loans.

$1,500,000 investment, but Nudo testified that he told Nizan that he did not want to get involved with that issue. (Nudo dep. p. 33-34).

Nudo also testified as to Merel's role throughout the 2004 transaction. He stated that Merel was not only a partner in the business venture; he also served as the attorney for the entire transaction. (Nudo dep. pp 9, 38-39, 40, 41). Nudo testified that he obtained separate counsel when he sold his interest in Poydras, because he did not want Merel to handle that matter. (*Id.* at 80).

Now that the important players have been identified and their connections to the debtor and the underlying transactions have been explained, let us turn to the transactions that give rise to the Complaint.

C. The 2000 Wellington Loan and Purchase of the Poydras Building

Clotworthy, who lived in New Orleans at the time, learned from SRSA Commercial Realty that the Poydras building, also known as the Freeport-McMoran building, in New Orleans was for sale. (Tr. p. 311). The building is a 23-story, Class A office building and corporate headquarters for Freeport-McMoran Copper & Gold, Inc., a publicly traded company, which is a large producer of copper and gold. Freeport McMoran, or a company affiliated with it, has always been the largest tenant in the Freeport McMoran Building and the term and provisions of its lease have always been the primary factor considered by lenders and investors when valuing the building. (Tr. 336).

Clotworthy "evaluated the numbers" on the proposed sale and then identified the investment opportunity to Byers in the fall of 1999. (Tr. p. 312, p. 820). Byers then began looking for investors to purchase the building. Byers negotiated and executed a contract, dated January 7, 2000, for the acquisition by Wexford Capital of the Poydras building at a total

purchase price of $37,500,000. (Ex. 43). However, it was Wexford BancGroup that funded the $250,000 deposit required by that contract. (Tr. p. 547) The original group of people involved with the purchase of the Poydras building was Byers, Clotworthy, Merel and Nizan ("the Original Group"). (Tr. p. 820).

Nizan testified that he first learned of the availability of the Poydras building from Cohen. (Tr. p. 141). Nizan presented the investment opportunity to Jordan Slone, whom Nizan thought might be interested in the property.[11] Slone was interested and at Slone's request Nizan set up a meeting in Chicago with the Original Group. (Tr. p. 141). Nizan testified that he never intended to personally invest money in the Poydras building, but thought that if he brought in an investor he would get an interest in the building (Tr. p. 142). Slone was considering investing approximately $7,500,000. (Tr. p. 821). Slone then visited the property in New Orleans, a meeting which Nizan was to attend, but he missed his flight. (Tr. p. 143). Slone met with Clotworthy, who gave him a tour of the building. (Tr. pp. 143, 312-13). Slone decided not to invest and Nizan testified that he did not look for another investor. (Tr. p. 144).

Nudo's group, Marc Realty stepped in when Slone declined to invest. (Tr. p. 315, Nudo depo. pp. 5-6). Marc Realty agreed to invest $3,800,000, but only if those putting in actual cash received a 12% preferred return.[12] (Tr. p. 315, Nudo depo. pp. 5-6, 13-15). However, with Marc Realty's investment and a loan obtained from Paine Webber in the amount of $29,200,000, there was a $3,500,000 shortfall of cash that the Original Group had to cover in order to close the

---

[11] Nizan had purchased the Lansdale Apartments from Slone, so he knew something of Slone's real estate dealings. Coincidentally, that loan closed in April 2000, the same time that the Wellington loan closed.

[12] Byers testified that he chose Nudo's firm over Slone's because Nudo was local to Chicago and the Original Group would receive a higher ownership percentage in the project if they went with his firm. (Tr. p. 822). The evidence does not bear out that a choice was to be had; Slone declined to invest in Poydras.

deal. (Tr. p. 822, Pl. Ex. 49). Clotworthy found two additional investors, Earl Webber and Ken Lobell, who added $1,000,000 to the deal (Tr. p. 314). Clotworthy received an ownership interest in the property for finding investors, but was not to receive any distributions until the cash investors received their priority return. (Tr. p. 314, 317). Additionally, Byers negotiated an approximately $1,000,000 reduction in the purchase price, which meant that the Original Group only had to raise an additional $1,500,000 to invest. (Tr. p. 827).

Byers testified that Nizan told him he had enough cash to cover the $1,500,000 shortfall. (Tr. p. 823). Byers also testified that he gave up his claim to a $900,000 brokerage fee to facilitate the deal. He testified that he and Nizan agreed that if Byers gave up his fee and Nizan contributed the $1,500,000, they would form an equally owned entity, WPN, LLC ("WPN"), to hold their ownership interest in the Poydras building. (Tr. p. 822). Byers testified that he felt justified in taking a 50% interest, even though he did not put in any cash, because he was foregoing his fee, he had brokered the deal with a large reduction in the purchase price, and he had obtained very difficult financing.[13] (Tr. p. 826-27). Later Byers said that Nizan told him he did not have the cash, but did have equity in several properties and was willing to pledge one of them in order to borrow the necessary $1,500,000. (Tr. p. 824). Byers testified that he does not remember the exact conversation he had with Nizan, but Nizan wanted him to negotiate with First Bank on Nizan's behalf regarding which property to pledge for the loan. (Tr. p. 824).

---

[13] Byers was able to secure a nonrecourse loan, which was difficult because of the risk of rollover and the location of the building; many companies were moving out of New Orleans and lenders were difficult to find. (Tr. p. 828-29).